All rise. The Illinois Appellate Court, Fifth Division, is now in session. The Honorable Justice Rainer W. Mitchell is presiding. Thank you. Good morning, folks. Please be seated. Our clerk will call our first case. 1-24-1781 Caleb Harper v. Lana Harper Good morning, folks. We've reviewed the briefing and the record of the matter so you can take that into account with your presentations. This morning we're going to allocate 20 minutes aside with an additional 5 minutes for rebuttal for the appellant. With that, we'll get started. Counsel, whenever you're ready. May it please the Court. Counsel, good morning. I am here on behalf of the appellant, Lana Harper. She is a New York Times best-selling author of a five-book series called The Witches of Thistle Grove. The seminal issue before the Court today is whether the trial court erred in treating advances against royalties the same as royalties. Illinois does not currently have an established rule of law in place on what advances against royalties are. And I submit to this Court they should be considered income under Section 504 of the Illinois Marriage and Dissolution of Marriage Act as opposed to how royalties are treated, which is as property under Section 503 of the Act. So there are three main issues before this Court today on appeal. The 50% perpetual award of future royalties and advances from Lana's books to Caleb Harper. Just to be clear, your argument is only that the Court awarded those royalties on the four books that were written before the dissolution of the marriage, correct? Well, the way that the judgment is actually written, Justice, is that it's the four books and any other book produced during the marriage. Okay. And there was an additional book, a fifth book produced. Dear Judge, for the books written during the marriage, the order is that the husband gets 50% net of royalties. And are there advances still to come on those books, some of those books? No. So the main issue is that the advances were received during the course of the marriage, almost $200,000. And those were spent by the parties for ordinary living expenses and were completely expended. So when the trial court awarded Mr. Harper 50% of those advances, in essence, it was a double dip because those monies were already expended, and now she had to pay an addition 50%. Our position is that advances against royalties is in the nature of income. It's kind of like a cash… I'm sorry. You have lost me already. I'm sorry. Okay. So these advances were all received during the marriage. Yes. Treated as marital property, spent during the marriage, and the court order was that she had to then give him 50% of those advances that had already been received? That's correct. And I think the issue is that the trial court didn't understand that there is a big difference between an advance against royalty and a royalty. Because if your honors might recall from the record, Lana Harper was barred from testifying about what the difference was. It made no offer of proof on that, right? Well, Justice, I was not the trial counsel, but I believe that in the record, then-trial counsel did attempt to. He was cut off, and then he did not finish his offer of proof. So there is no offer of proof in the record. However, I believe that the trial court should have let Lana Harper testify, and that would just go to weight versus admissibility. She had a background as a literary agent. She was an author. She understood what an advance was versus a royalty, and I'm not quite sure the trial court did, which is part of the error is awarding Mr. Harper 50% of those advances that were expended during the marriage for ordinary living expenses. Nobody during the course of the trial said that those funds, the $200-some-thousand, were wrongfully expended. There was no dissipation claim on file. So those were used as cash, like a signing bonus or ordinary salary that authors typically receive from publishing companies as income as they're writing their books. I'm sorry. That would have some support in the Hines decision, because in that case they said that I think it was royalty income was spent on family expenses, and it's clearly not subject to division, right? Exactly. So I don't think that Hines differentiates between an advance and a royalty. I don't think there is a difference myself. I'm not persuaded by that one bit. An advance on royalty is an advance on royalty. It's still royalty, but the problem is that it was money that was expended on family expenses during the marriage, and so you might have an argument there that it would be inequitable to subject that to a division. Well, and I respectfully disagree with Your Honor just because an advance against royalties is a cash payment up front that does not need to be paid back, whereas a royalty is not a guarantee. You have to, as an author, go out, promote your books, promote yourself and your profile in order to sell enough books to earn back the advances that you receive from the publishing company to get to the royalties. So once she receives – well, before she receives her royalties, once they establish that there are royalties that are due, are they then – they being, I guess, the publisher – then deducting the advance? No. So they never take that advance back? Correct. The advance is kind of in the nature of salary or a signing bonus. They're paid up front. You start writing. You get them in installments often based on publishing deadlines and deliverables, and then once you get the entire advance, the book goes into publication, and if you sell enough books on the back end and you've earned back all of those advances, then you start to get royalties. So you first – they first get credit. It's royalties. Right. Let's say you were going to get a million dollars – you've earned a million dollars in royalty and you've had a $500,000 advance. You only get $500,000 in royalties because you've already taken the $500,000 as an advance, correct? I don't believe that that's how it works. I believe that $500,000 advance is your up-front payment for delivering the publication. And it's not against royalties. It's on top of royalties. Is that what you're saying? Justice, I believe that is how it works. I am no literary agent expert. However, I believe every contract on these publishing companies may differ. But the point being that those royalties – So what is it in this contract then? Do we have that contract that says what you purport that it says, that they do not recoup this advance? So I believe that those contracts were part of the record and exhibit at trial. But again, Lana was barred from testifying about her understanding of the contracts. But they're not in the record, aren't they? So, yes and no. There was a big issue, and I'm sure that your honors are very familiar with the procedural history in this case and kind of the mess that there were three judgments entered. I filed multiple motions before this court to try and get the trial exhibits into the record. I filed a motion in front of the trial court to get the trial exhibits into the record. My opposing counsel would not stipulate to those. And meanwhile, I was being told by the appellate supervisor over at the clerk's office that they were in the record. So even as I stand here today, I'm not completely sure what trial exhibits made it into the record and what wasn't. Because the trial court did not grant me the relief. Counsel would not stipulate. Your obligation to furnish the reviewing court with a sufficient record. It's not that hard to supplement the record. If exhibits got left out of the record, you go back to the circuit court, you make a motion, and then the circuit court clerk transmits a supplement to us. I acknowledge that, Justice Mitchell, and that was done. The trial court denied that relief, and part of the appendix on appeal included the trial exhibits, and the appellate court issued an order that that would be taken up with the case, whether or not that appendix would be accepted. So to answer Justice Johnson's question, some of those publishing contracts are included in the appendix, but whether or not Your Honors allow that to be in was to be taken up with the case today, since the trial court denied my motion to supplement the record. Okay. So we have two factual questions here. One is your contention that advances don't get taken from the royalties that you would otherwise get. You're contending that that's true, but that's counter to our understanding, because it's an advance against royalties. But my other question is, you seem to be saying that the trial court awarded Caleb royalties and advances earned during the marriage, before the dissolution of the marriage, and I'm reading the trial court order that it's for documentation, that she needed to provide documentation for any funds received after April 26, 2023. Correct. Which was the first dissolution judgment, correct? That's correct. So she only owed money for what happened after the first dissolution. Anything that she got before that first dissolution was not part of this 50-50 split, correct? That's correct. And you're saying that after that April 26, 2023, there were $200,000 in advances? No, I'm sorry if I misstated that. The $200,000 in advances occurred prior to 2023 and were expended as marital income. Right, but she didn't have to pay those again. She only had to pay for what she owed.  Correct. Yes, that is correct. So what is the double-dipping? So the double-dipping is that my contention is advances against royalties is cash income, and so when the court found that both parties were self-supporting and therefore not maintenance candidates, that additional advances that she receives after that April date is cash income, then she now has to pay 50% to Mr. Harper, which is akin to maintenance under Section 501. So she was still getting advances after April 26, 2023, on books that she had already written during the marriage. Correct, and those have additionally been paid now post-decree. And part of the issue is under Section 504, this award to him of 50% of those advances far exceeds the statutory guidelines on maintenance. I mean, as Your Honors know— Where is the evidence that she had advances after April 26, 2023 for books she had already written during the marriage? Where is the evidence of that? Well, those were received post-decree, so they are not part of the appellate record. I also think that Your Honors— Because my understanding is you get the advance before you write the book, generally speaking. Not the complete advance. There are installments. And so I believe that you end up getting the final installment when you deliver the publication to the publisher and it goes to print. And so at the time this judgment was entered, not all of those advances have been paid up to date. So the bottom line, though, is with respect to Justice Mitchell's contention in Hines, I don't believe that one paragraph covers the advances against royalties. But we do obviously agree that royalties, as applied in the Hines case from the 3rd District, do apply. It is marital property, and Caleb's award of 50% was inappropriate in the percentage, but appropriate as a marital distribution. And here's why. There isn't a precedent in Illinois for a spouse who is a non-author getting 50% of a royalty. There's only one case in Illinois. That's correct. And so when you look across the country at persuasive authority, there isn't a single case with the exception of one out of Florida getting 50%. And in that case, the parties were married for 46 years. This case, the parties were only married less than six. All other cases across the country that I could find went between a 20% and 30% royalty award. And the reason is, as set forth in Hines, the author's spouse has a lot of post-marital efforts that go into creating these royalties to sell their books. So Lana testified at trial that she attends book festivals, goes to signings, readings at schools, libraries, bookstores. She hosts giveaways, social media campaigns. All of those things continue on, even post-divorce, to drum up her name, her reputation, excitement over just the five books in the series, but also new books that she's continuing to write, which the Hines Court actually talks about as well. In that case, the wife continued to write her books post-marriage, and the Hines Court said even new books created post-decree drum up her name recognition and her reputation and cause more books to be sold from the marital portions, which then increased her royalties. And so the 50% award to Mr. Harper was way in excess of what is appropriate, given all of the efforts that Mrs. Harper needs to do. We agree it's a discretionary decision, right? It's a discretion. It's an abuse of discretion standard. That is the standard, yes, Justice Mitchell. And in Hines, the appellate court was basically acting as a trial court and came up with that percentage. That's correct, because in that case, I believe the trial court judge was retiring, and so they took it apart. Exactly. But I would again point to the persuasive authority that there really is scant case law out there awarding 50% to a spouse. And in this case especially, we have a short-term marriage, and we don't have a ton of financial or other contribution from Mr. Harper. I think what was presented in the papers by Mr. Harper's counsel was a little bit overstated. So I'm struggling with this to understand how it would constitute an abuse of discretion. Judge Posner down the street used to say, an abuse of discretion means that two trial judges deciding the exact same issue could reach opposite conclusions and both can be affirmed, so long as they exercise discretion. So where is the absence of discretion? We made these arguments. These arguments were made to the trial judge at least, I think, in a motion to reconsider authority from outside of Illinois was presented to the trial judge. The trial judge considered it and rejected it. Right. That's fact. And made a judgment call. And you're not happy with – your client's not happy with the judgment call. But where is the abuse of discretion? What constitutes that abuse? Well, first, the testimony from Mrs. Harper about all of the efforts that she personally made to draw up support for her books. That was without contribution to Mr. Harper. Mr. Harper made no financial major contributions during the marriage to support her while she was writing these books. And additionally, the lack of precedent in both Illinois and across the country to award a spouse on a six-year – less than six-year marriage of 50 percent in perpetuity, that's an abuse of discretion. Because that far exceeds anything under Section 503 where we have to distribute marital property in just proportions. When you look at Section 503, the factors, one of the factors is length of marriage. The other factor to consider is contribution relative to both parties. And so there just simply is nothing that the trial court can point to to support that Mr. Harper did so much during the very short-term marriage to support Mrs. Harper during her working on this five-book series to support that 50 percent royalty in perpetuity. So I believe that based on all of that, that is an abuse of discretion. There are a couple other issues before this court today, including the superior property proceeds and the undisputed tracing by both parties' trial testimony on the down payment on the superior property. Lana testified, as did Mr. Harper at trial, that she sold a premarital home that she co-owned with her father in Massachusetts, and she took $506,000 from that sale, contributed the entire down payment for the superior property, that those funds were transferred directly through her sole account into the Chicago Title and Trust Company, and that contribution was her non-marital contribution and not meant to be a gift. Is there any evidence other than her testimony to overcome the presumption that it is a gift? Well, nobody really offered any testimony on this, Mr. Harper. But there's a presumption that it's a gift to the marriage. Correct. How do you make a down payment on a marital home? What is there to overcome the presumption other than her testimony at trial, if anything? That was the sole testimony and the sole evidence at trial. I would just remind Your Honors that that is a huge sum of money. Mr. Harper acknowledged that was her premarital source of funds that paid for the down payment, and that regardless of title on this property, that is not conclusive when classifying. And so we believe that that ought to have been reimbursed to Lana because there was clear and convincing evidence tracing that non-marital property into superior. I also would remind Your Honors that there is a third claim relative to the MIT property settlement that Mr. Harper received during the marriage. That was an employment-related cash settlement that he received when he was terminated there. It was $290,000, half of which were used by the parties for joint living expenses. The other half was received during the course of the parties' divorce litigation. Mr. Harper took those funds, and they were never seen again. Mrs. Harper filed a dissipation claim, which was denied by the court, despite the fact that Mr. Harper never answered with specificity as to where the funds went. And even if there was no dissipation here, this is still a property settlement payment that is marital property and should have been in the parties' judgment for dissolution of marriage. The case law on this point, which includes in Ray the Marriage of Pace, which was a personal injury settlement analogous to an employment settlement as we have here, states that a settlement like this obtained during the marriage is marital property. And so the fact that that is not in the parties' judgment is a pretty glaringly obvious error that should have been dealt with by the trial court. And on a motion to reconsider, the trial court declined with no real reason for why that big property settlement was completely ignored. So for the reasons stated, the royalty in advance award was an abuse of the trial court's discretion. We are asking that this court set precedent on the advances against royalties issue and that you take a look at not just the Hines case, but the persuasive authority across the board on the percentage breakdown for the royalties and consider the post-marital efforts that go into accruing those royalties and consider reducing Mr. Harper's royalty payment to 20% or 30%, or in the very most, that if you keep it at 50%, that there ought to be a termination date on that consistent with the statute. Because to have this happen in perpetuity is not just inequitable, but it also causes a lot of... Is there any precedent for that? If it's marital property, it's marital property and anything that's earned on it belongs, is divided between the two parties. Is there any precedent for saying only for 20 years or 10 years? Do you have a case that says that? I do not, Justice McLeod. That would be making law. However, I think that when you consider the length of the party's marriage as being less than six and the fact that she has to pay royalties to her husband or her ex-husband for decades, possibly longer, that is inequitable. And one of the things that should be considered and was touched upon in Hines as well is that in figuring out the net of tax reward, the deductions, the accounting fees and things like that, that is at every quarter an issue and a responsibility that Mrs. Harper has to have now for perpetuity. But there's no way around that unless you want to pay the 50% of the gross, which of course your client doesn't want to do that. No, of course. But what I'm saying is that every quarter the parties have a fight over what deductions they should take, what kind of filing she should take, how much money she should have taken, were the agent fees reasonable and customary, and it just adds to more litigation. And I know it's not before you in the record, but that's exactly what has happened. And so I would just say that the 50% award combined with the in perpetuity added on top of the fact of all of this additional accounting nightmare has created a quagmire and is inequitable and needs to be handled because it really was an abuse of the court's discretion. I'm also asking that your honors consider the superior property division was against the manifest weight of the evidence and the dissipation ruling misapplied the law in connection with Mr. Harper's explanations, his voluntary unemployment, and the lack of handling of this property settlement payment in the judgment. I'm sorry, one last question and then I'll let you wrap up. If we were to agree with you that advances should be treated differently than royalties, where in the record does it say how much in advances as opposed to royalties was paid out post-dissolution? That's not contained in the record because it was post-dissolution. And so I think that's also part of the problem. So you're suggesting we say it should be treated differently in remand for recalculation in the trial court? Exactly. And I'm suggesting that that be done under the auspices of Section 504 of the Illinois Marriage and Dissolution of Marriage Act, treated as income as opposed to property because that's exactly what it is. It's income that authors live on to pay their bills and expenses as they're writing the publications. So I am asking that you reverse and remand those issues with instructions to recalculate those royalties and advances consistent with Hines and the post-marital efforts principles, reimburse Lana for the superior pre-marital residence down payment, and consider those MIT funds. Thank you. Thank you, Your Honors. Good morning. Good morning, counsel. May it please the court. As this court is aware and as decades of precedence establish, the case before you must be decided on the record Ms. Harper has placed before it, not the record that she wants that doesn't exist. This is a record that is devoid of exhibits, devoid of the facts necessary to support Ms. Harper's legal theories, many of which she failed to raise at any time prior to reconsideration. While Ms. Harper's appellate counsel may have tried this case differently had they represented her, that's not the case here. The case rises and falls on the record as it exists, a record containing one common law volume, one recorded proceedings, and not a single trial exhibit. And viewing that limited record in a light most favorable to my clients under a highly deferential standard of review, one plays a... Why did the trial judge deny the motion to supplement the record with trial exhibits? There was a tortured history behind that, Your Honor, and if you'll give me a moment I can lay out exactly what happened. There were repeated attempts, which I would call putting the cart before the horse, where Ms. Harper came first before this court and said, let me supplement the record. And our response... So by the time Ms. Harper finally got around in late May of this year to filing a motion to supplement a record, to prepare a supplemental record in the trial court, the case had been fully briefed for two months. Why would the trial judge... It's not uncommon that trial exhibits don't make it into the record, and it is routine that then they come in by way of a supplement. So I don't understand why the trial judge would deny that motion. I would say timeliness is one major factor. Again, this case was a 2024 appeal. Ms. Harper did not file the motion. The motion should have filed... The only issue before the trial court in supplementing the record is, were these exhibits that were submitted to the trial court in the proceedings before the judgment was entered or not? That's the only thing they have to decide. It's not their role to consider whether the appeal has been fully briefed or whether it was not timely or not. Those are all issues we can take up. And I think there's a second matter, which goes to Your Honor's point, and I brought this up in my response brief. I don't even think it was clear from the exhibits that counsel proposed that they were actually seeking to admit the proper exhibits. Look at the appendix to the appellant's brief. It cites Exhibits 42 and 43. There were no Exhibits 42 and 43 introduced at trial. The order the trial court entered on September 9th of this year denying the motion to supplement simply says that Ms. Harper failed to meet her burden. I agree with that assertion. She tried again and again and again, doing it the wrong way. I never received a stipulation saying, here, sign here for the exhibits. I signed one for the report of proceedings. We got all the transcripts into the record. But by the time this finally rolled around to the trial court, one, it wasn't done correctly, and two, I argued that it was untimely, that it was prejudicial. The case had been fully briefed before, Your Honors, for nearly two months by the time the motion was filed. By September 9th, when the trial court denied the motion, my reply brief had been in file for almost six months. So we're stuck with a record that it was Ms. Harper's burden to provide that doesn't contain the vital contracts that she is asking this court to interpret. Now, going to this issue of royalties, there's no dispute that the royalty streams are marital assets. That's what the Hines Court says. Counsel admits that in her briefing. The first issue that she addresses, one where she's trying to manufacture an issue of first impression, has to do with the advances versus royalties. And without citation to any authority, in this case, in this state, or nationwide, she posits that these advances are, quote, an entirely separate, legally distinguishable source of proceeds from the royalties themselves. That's page 10 of the reply brief. Do you know if under the contracts that were in issue, or were in evidence for the trial court, aren't in the record now, but do you know, did the publisher recoup the advance on royalties? So, if you look at the record, actually, there is some argument of counsel. I'm not going to call a testimony, and the court about this. On page 107, my trial counsel here references the facts that if Ms. Harper, for example, fails to deliver a book, the publisher can recoup those advances. Sure, that makes sense. But if she delivers the book, the book starts generating sales and income. Correct. Does the publisher have to pay royalties before it recoups the advance? No. I think that's why they are in advance. Okay. So, conceivably, if this contract were structured differently, this contract that we don't have, Ms. Harper could have taken zero advances, and the second that first book sells, she gets a royalty check. Essentially, the distinction is she took her money up front rather than taking it on the back end. In my mind, it's somewhat analogous to a 401k loan. You're borrowing against a future asset, but that doesn't mean that that asset, the money that you're borrowing, is something else. You're literally taking money that you normally would take later, now. And taking this argument to its logical end, by Ms. Harper, are these contracts being structured in such a way that she gets advances up front? It means he's not getting the benefit of marital assets. In the situation I just envisioned, where there are no advances, let's say that she is independently wealthy and doesn't need the money up front, and the royalties start flowing in the second the first book sells, my client starts getting the fruit of that marital asset. But what Ms. Harper is trying to do is draw an artificial distinction and say, well, because these funds were given to me before I sold any books, they're mine to keep. I don't think that's equitable, and I don't think there's any legal authority cited anywhere in the briefing to support it. Again, without the contracts, we're somewhat left flailing. Do you know whether there were advances still to come on these? Is it four books or five books? Four books were determined marital. The fifth book was not completed at the time of judgment, and that is Ms. Harper's alone. So there are only four books. Right. Okay. So do you agree that there were advances still to come on those four books after the dissolution of the marriage? I don't know. I don't believe so, because like one of your honors said, and I apologize if I forget which one, once the books are written and published, I don't think you're getting advances anymore. You're getting royalties. And just to make that to your point, looking at paragraph L sub G of the judgments, Ms. Harper only has to pay advances received on or after April 26, 2023. So the argument is four advances. Right. The argument that there was a double dipping, that she somehow had to pay my client back for royalties she had already received and spent? No. Has no support in the record at all? Right. At its core, I fail to see a distinction between these royalties and advances on royalties. And without the contracts in front of us to see what Ms. Harper and Penguin agreed upon, we're grasping at straws in a dark room to try to create reversible error here. Now, on the issue of the division of the traditional royalties, let's call it that. The gist of Ms. Harper's argument is that she should receive a disproportionate split because of all of the future efforts she has to extend to promote and market and sell not only these books, but her brand. And I would ask your honors to look at the record. This is what the court did in Hines. It certainly did, your honor. But in the Hines court, the Hines court was faced with significant evidence, not just from Barbara Hines, but from the chief marketing officer of her publishing company. There was specific testimony that Ms. Hines belonged to state, local, and national speech pathology associations. She was the president of the state branch. She participated in workshops and seminars not only in this state and in neighboring states, but nationwide. She gave speeches at association events. She testified that there is a definite connection between her name recognition and the sales of her books. And based upon that record, the Hines court found that connective tissue between Ms. Hines' efforts and her future book sales. Here, looking at page 374 of the report of proceedings, you have one question and one answer about what Ms. Harper did to market these books. She wrote essays. She attends events. She travels to book festivals, if she's able, and does social media campaigns. I mean, again, there's nothing in the record, but textbooks inherently feel different to me than I think these are works of fiction in that I think generally authors produce more works of fiction than textbooks. I don't know. Based on my experience in buying textbooks in law school and then buying the next edition of the textbooks in law school, which cited the same 100-year-old cases, I think that the same holds true for academic works as well. Right. I will say that in the academic context, there is... You can't ignore the professional credentials. Mrs. Hines was a college professor in speech pathology. There was testimony of her expertise in that field. And maybe I was a little glib in my brief, but there was no testimony, no evidence adduced regarding Ms. Harper's expertise in the subject matter upon which she writes. There was no evidence of the research she conducted into the occult. We don't know how much time or effort or blood and sweat and tears she put into marketing these books. There's no question that her counsel could have asked her the follow-up question. You could have let her elaborate. That didn't happen. As we sit here today, we have no idea how many essays Ms. Harper has written, where those essays were published, or what they were about. We don't know how many book club events she attended. We don't know how long she stayed or what she did there. We don't know the first thing about these social media campaigns, when they took place, how frequently they took place, or what kind of engagement they generated. Unlike the Hines Court, we don't have any tangible evidence linking Ms. Harper's alleged post-judgment marketing efforts to sales. Well, counsel, wouldn't you agree that any subsequent success would also benefit these first four to five books? So let's say she writes another New York Times bestseller. Isn't it likely that people would then say, oh, let me go and read the first series that she wrote, thereby making that series even more successful and having continued success beyond the initial, I don't know what they call it, issuing or release? I think that's certainly plausible. But the question then becomes, if Ms. Harper writes a book post-judgment that takes off such that her marital books become popular, how is that any different where, for example, we represent somebody who has an interest in a private equity fund, and there's a carried interest that the other spouse tags along with. And three years post-judgment, this happened in a case of mine, the fund invested heavily in Zoom right around 2019, 2020. My client won the lottery, but so did his former wife, simply by virtue of tagging along. My client continued to work for the fund and do what he did, extend his efforts, but it was still a 50-50 split, and I think this would be no difference. So my point being that she doesn't have to write additional essays. She doesn't have to attend the same number or more book signings or any of the other things that you mentioned in order for those books to continue to generate income or royalties that your client would then benefit from tagging along. I agree. She can conceivably do nothing. I'm reminded of the great American author Thomas Pynchon. Hasn't been seen in public since 1955. Hasn't done a single speaking engagement book tour or any of these things in his novels. So they hit the bestseller list every time they come out, through no, if he were divorced, no post-decree efforts of his own. But the point we have here, and the problem that I think this Court has, is that lack of connective tissue. That lack of the, quote, definite connection, which the Hines Court stated, between these efforts and Miss Harper's future book sales. We don't know. There was no testimony saying, if I go to this book fair, if I attend this event, my sales will increase. There was no testimony from the Chief Marketing Officer of Penguin saying, we require authors to... Well, I was going to ask, did the contracts that were in evidence for the Trumper, did they have a best efforts clause? I'm not sure if they had a best efforts clause, Your Honor, but I know that they did have provisions in there regarding Miss Harper's ability to market, and I believe it had to be done with the approval of the publisher. I'm not sure, again, I... Back to the question posed earlier. Let's be clear, these exhibits are not in the record. This is like being pregnant. Either they are or they aren't. Well, they are in the record in part because of your efforts to keep them out of the record. I wouldn't say my efforts are on that. If somebody handed me a stipulation and said sign here, I'd have no legal basis not to other than arguing prejudice, I suppose. If that stipulation was tendered to me, if the motion was filed in 2024, at any time, I think it would be a different story. I basically asked counsel in this court to follow the rules, and it did. But the fact is, the record before us is the one we have now. And on a deferential standard of review, I don't believe it's incumbent upon this court to fill the holes in the record that Miss Harper failed to patch below or allow her to bring in all these different factual statements appearing nowhere on the record to sway Your Honor's decision. The trial court heard considerable evidence below and presided over this trial for three days. Counsel, can you address the net sales proceeds? On the superior residence? Yes. Absolutely, Your Honor. So there's several problems that Miss Harper has with this argument, the first of which being her counsel's own statements that he, quote, couldn't trace the funds with any real specificity and that the trial court was going to find the funds to be marital, and he simply advanced an equitable argument. So before we get into the substance of it, we need to be clear about what was argued below and what we're arguing now. There was never a reimbursement argument made in the trial courts. The words 503B or 503C appear nowhere in the trial record. Now, I understand forfeiture is a limitation on the parties, not in Your Honor, so I'll get to the substance of it. To sustain the claim that she didn't assert, Miss Harper not only was required to trace these funds to a non-marital source by clear and convincing evidence, but to also overcome the presumption that she intended to make a gift to those funds by placing them into a form of joint tenancy. She did neither. There was no specific evidence, no specific testimony, and not a single document tracing this specific pool of funds from the premarital condo to the jointly titled Marblehead home in the summers of Boston where the parties paid down a mortgage to the superior down payment many years later. And I cited in my brief Your Honor's decisions in Didier, Starr, and Bergerich where a party can't simply say the funds came from a non-marital source, not produce a single document, not produce a single bank statement, and expect to prevail in a court of the first instance where you don't have a highly deferential standard of view. But let's get past that. Even if she can trace those by clear and convincing evidence, where is the evidence overcoming the presumption of a gift? And under the McBride case, she was required to present clear, convincing, and unmistakable evidence that she lacked the donative intent when she placed these allegedly non-marital funds into joint tenancy with her husband. Why is her unrebutted trial testimony to that effect not sufficient? Because as Your Honors held in Bergerich, I think, in 2020, a perfunctory affirmative response to a leading question does not amount to clear and convincing evidence. I respectfully submit to Your Honors when somebody asks you what did you do with this money, you say it was a contribution, not a gift. That is not something that human beings say. No one says this was not a gift, it was a contribution. Given the trial court's credibility finding as to Ms. Harper's testimony, I think that it was well within its discretion to not credit that testimony, especially where there was no other corroborating testimony supported. My question is a little bit more sophisticated, which is does there need to be some evidence contemporaneous with making the down payment on the Superior House that it is her intent at that time to have it retained separate? I think that would certainly be helpful, Your Honor. And again, that's also probably not something happily married people do. No one says sign here, confirm this is my non-marital property. But, you know, you have to look at everything they did. There was no evidence of their intent to treat this as separate. Mr. Harper testified that they never had a conversation about it. There was never any discussion that these were going to be segregated in the event of a divorce. The fact that Mr. Harper paid the mortgage, the fact that the parties jointly paid the property taxes, used marital funds towards this commingle home, I think all mitigates in favor of affirming the trial court's decision. And again, on a deferential standard of review, where Ms. Harper has not one but two presumptions to overcome, I don't think that there is enough here to establish reversible error, especially when the reversible error require your honors to find that the trial court erred by not considering a claim Ms. Harper never made. I don't have a lot of time left. I'd like to touch on the dissipation issue. And the gist of this is that Mr. Harper, because Mr. Harper left his job, spent the severance on living expenses rather than working. That somehow constitutes dissipation. This court should not be the first to credit such a theory. Dissipation is the use of marital property for a non-marital source when the marriage is undergoing an irretrievable breakdown. No court has ever said a party's failure to earn an income constitutes dissipation. You could have imputed income to Mr. Harper. You could have ordered him to maintain a job diary. There are a number of remedies available, but dissipation based on not working is not one of them because not working is not a use of property. The second problem Ms. Harper has, and I think this one is impossible to overcome, is that Mr. Harper didn't just offer testimony. Assuming that Ms. Harper established a prima facie case of dissipation, the trial court's judgment is clear. She denied the dissipation claim not just because of Mr. Harper's testimony, but based on Exhibits 13, 18, 22, 23, and 28, all of which were before the trial court, none of which are in the record today. Finally, these expenses, even if Ms. Harper can get past that, the main one cited in her brief, he paid down student loans, which my client testified he paid throughout the marriage. So there goes the unrelated to the marriage concept. If a party spends money a certain way throughout the marriage, it continues to do that during the irretrievable breakdown. It is not dissipation. And support for a child of a prior relationship, which again my client supported throughout the marriage without complaint, without issue. So I do not think the trial court abuses discretion in denying the dissipation claim. It bears repeating that this is a court of review, not a court of the first instance. Every decision the trial court made here is entitled to substantial deference. And I've heard Judge Posner's quote. The other one that I heard, Your Honor, was that an abuse of discretion must hit you with the force of a five-week-old unrefrigerated fish. It's a little colorful, but I think it really hits home exactly what Ms. Harper's burden is here and why she cannot meet it, even with a complete record. The error that Your Honors would have to find would be so palpable and so obvious, such that no reasonable person could ever in their right mind decide the way the trial court did. You don't have that here. And in the absence of a complete record, in the absence of the contracts Ms. Harper is trying to get you to interpret, in the absence of that connective tissue present in the Hines case linking the wife's efforts to the future royalties, in the absence of all the other trial exhibits, I submit that Your Honors have no choice but to affirm. And that is what we are asking for today. Thank you for your time, Your Honors. I will start with the record issue because I think that bears repeating. My office attempted 1, 2, 3, 4, 5, 6 different times to supplement the record. We listed in our motion in front of the trial court the exhibits 40 through 44, 48, 49, 54, and 51 to all be included. And that was denied. And here's what happened that I think is significant. The trial judge was presented that motion to supplement. She kicked it to the post-decree judge who knew nothing about the case, heard it for the first time, and denied it. And counsel fought against it, as Your Honors pointed out. Why? These were trial exhibits admitted at trial. Why would that be an issue to enter those as an appendix or a supplement to this record? Counsel indicated that those exhibit numbers, at least one of them, did not exist. I'm not sure. That might be, Justice Johnson. I went through the record, which was admittedly a bit of a mess. And I went through to make sure each of the trial exhibits that I requested of the trial court be supplemented were, in fact, admitted. Because it wasn't always crystal clear whether a trial exhibit was actually admitted or not. But the ones that I presented in front of the trial court were, in fact, admitted. And counsel tried to argue that he wasn't sure if they were, in fact, admitted. Well, that's part of the reason why the trial court denied that. I'm not sure why counsel fought against it. The trial court denied your motion to supplement. Yes. Can you come back to us and tell us then? I do not believe I did. I think that was my last-ditch effort. I had already filed three motions in front of this court. We don't supplement the record because we don't know what goes in the trial record, right? That's why it has to start with Trump. I understand. I understand. I just wanted to let your honors know that it wasn't for lack of trying. Now, the advances against royalties issue, it's not – I'm not trying to start a lack of law or present your honors a case of first impression just for fun. I truly believe that there is nothing in the law as it stands now that deals with advances against royalties, which is a different concept altogether. Now, there's no cites in the briefs because there's nothing on point in Illinois or really across the country there's a dearth of case law on the advances issue. So that's why there's no case law cited in my brief. Justice Mikva, you asked about the four books. There is a fifth book. That was not addressed in the trial level. In fact, Mr. Harper's counsel argued that it was not marital property because it wasn't complete. The problem is that the way the judgment is written with the catch-all at the end in that section L that was cited, which says, you know, it lists paybacks of which from bad to curse, back to spell, and in terms of way, and it says all other books written during the marriage, the post-decree judge interpreted that section to include the fifth book. And so we are arguing about advances against royalties paid after April 2023 because of this fifth book that wasn't addressed in the judgment but was caught in a catch-all. So there was a fifth book, and I wanted just to make that clear, advances were received after that April 2023 date. With respect to the post-marital efforts argument and this lack of connective tissue, I would disagree with counsel that there was no testimony from my client at trial about what she did. I was going to go back to this fifth book issue, which counsel just said there is no fifth book, and you're saying the trial court, is that something you're trying to straighten out in the trial court? Because that sounds like it's a trial court issue, that the post-decree judge is confused, according to you, about what the decree says, and that seems like something you have to straighten out in the trial court. I'm not even saying that the post-decree judge is confused. She made that ruling that there was a fifth book that was included, and so when Your Honor asked about whether there were four books or five, there was a fifth book. It was discussed at trial. Mr. Harper's counsel said this isn't marital property, but now it's being argued it is, and it was found to be marital property. And so I'm only making that distinction because under the judgment, Your Honor asked if advances were received after. It wasn't finished, so therefore advances would still be coming.  But I'm not convinced that that fifth book should necessarily be part of this, and that seems to me like something you need to straighten out in the trial court, but that's not what's before us. Right. So with respect to these efforts that counsel stated are just not connective enough, as opposed to the Hines case, I would respectfully disagree that Lana testified to the personal efforts at trial. I write essays for magazines, for online features. I do book club visits, library visits, school visits, bookstore events. I travel to book festivals. I also do social media campaigns, giveaways by myself, giveaways with other authors. Some of it is also just creating social media and generating new ways to publicize the book and to help the publisher's efforts. That's cited in the record, page 374. So simply put, she is having activities. She is contributing to her reputation to enhance the sale of the books. Was there any evidence aside from her testimony? Not that I am aware of, Justice. Okay. I would also point out, Justice Johnson, you asked about what would happen if there was another New York Times bestseller post-decree that yields continued success, and I think that's exactly right, and that was addressed in Hines as well, where the court said that author continued to write post-decree, which enhanced her reputation in book sales, much as here. If Lana keeps continuing, her profile continues to raise, Mr. Harper gets that benefit. And that fund explanation or example given by counsel with the Zoom fund, I think that's a little bit different and falls a little bit flat, because in that case, Zoom got popular due to the pandemic, not because counsel's client did something post-decree effort-wise to increase his company's reputation or anything like that. So I think it's not quite analogous to say… Sounds like he made investment decisions, but that's kind of either here or there. It doesn't matter. That's not the controlling case. But the point is, marital property that gets split sometimes appreciates greatly in value, and the spouse will benefit from that great appreciation in value. That's how marital property that's split goes. I agree with you, Your Honor, but I would just, again, point to Hines saying, yes, true, but we also have to give special deference to the fact that… The Watson House does the work to make it appreciated. Exactly right. We understand your argument. Okay. So with respect to the superior property, just briefly, I would just say that the tracing was unnecessary when both parties uncontroverted testified that that money came from a premarital portion. And, in fact, Mr. Harper acknowledged that there was a tracing from Lana's first apartment. I understand it's not just the tracing. It's also overcoming the presumption of donative intent. I understand. But even if we say that she's not entitled to a full reimbursement, there's still that contribution piece of she initially put down $506,000. Maybe she doesn't get a dollar-for-dollar reimbursement back. The court could have given her a disproportionate share of the equity on superior in acknowledgment of the fact that she used a non-marital source that was far in excess of Mr. Harper's contributions. The other thing I wanted to just point out about the dissipation claim is that it's not just about Mr. Harper leaving his job voluntarily and not taking a $300,000 salary and the fact that he spent that money. Maybe it was dissipation. Maybe it wasn't. I still think that it was error for the court to not address the settlement at all. You don't see a single paragraph or sentence in the judgment dealing with the fact that an almost $300,000 settlement came during the marriage, was marital property, and half of it went to Mr. Harper without explanation, division, or anything. That is something that maybe it goes on his side of the ledger and Lana gets a credit somewhere else, but it should have been dealt with. It's a big sum of money to just be absent from the judgment altogether. And so I do think that that's error. So for the reasons that I argued before, Your Honors, when I first came up here and then now just today, I would thank you for your time. I ask that you reverse and remand with instructions. Thank you. Okay, thank you, Counselor. Before we go to the next scenario, I just want everybody to take a moment of silence and get that word out.